RECEIVED
JAN 27 2003
AT 5:50 P.M.
WALSH, CLERK

FILED
JAN 27 2003
AT 8:30 ..........M
WILLIAM T. WALSH
CLERK

WOLFF & SAMSON PC
THE OFFICES AT CRYSTAL LAKE
ONE BOLAND DRIVE
WEST ORANGE, NEW JERSEY 07052
973-325-1500
Armen Shahinian (AS 8196)
Ian S. Marx (IM 1704)
Attorneys for Defendant

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| FARASH & ROBBINS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>FLEET BANK f/k/a SUMMIT BANK,<br><br>Defendant. | HONORABLE<br><br>CIVIL ACTION NO: 03CV361 (DMC)<br><br>**NOTICE OF REMOVAL** |

TO: William T. Walsh, Clerk
United States District Court
for the District of New Jersey
50 Walnut Street
Newark, New Jersey 07101

Fleet Capital Corporation (successor by merger with Summit Business Capital Corp.), by and through its undersigned counsel and pursuant to 28 U.S.C. §§ 1332, 1441 and 1446, hereby petitions to remove to the United States District Court for the District of New Jersey, the state court action now pending in the Superior Court of New Jersey, Law Division, Bergen County, which is docketed under Case No. L-9999-02. In connection with this petition, defendant respectfully represents as follows:

1. On or about December 16, 2002 plaintiff Farash & Robbins, Inc. filed a Complaint in the Superior Court of New Jersey, Bergen County, against defendant Fleet Bank

f/k/a Summit Bank alleging that it has been harmed by defendant's purported breaches of a credit facility (the "Complaint"). Plaintiff named the wrong entity, "Fleet Bank", as the defendant in the Complaint. Fleet Capital Corporation is the successor by merger with Summit Business Capital Corp. Plaintiff apparently attempted to effect service on an affiliated entity on or about January 6, 2003.[1]

2. Pursuant to 28 U.S.C. §1446 (a), copies of all pleadings and orders received by defendant are attached hereto as Exhibit 1.

3. As of this date, defendant has not filed a responsive pleading in the state court action commenced by plaintiff, and no other proceedings have transpired in that action.

4. This Notice of Removal is timely filed pursuant to 28 U.S.C. § 1446(b), in that it is filed within thirty (30) days of the receipt by defendant, by service or otherwise, of a copy of the Summons and Complaint.

5. This action is one of which the Court has original jurisdiction pursuant to 28 U.S.C. § 1332, and is one that may be removed to this Court by defendant pursuant to 28 U.S.C. § 1441, et seq.

5. As alleged by plaintiff in paragraph 1 of the Complaint, plaintiff is a corporation operating in the State of New Jersey with offices in South Hackensack, New Jersey. (See State Court Complaint attached as Exhibit 1 hereto). Further, plaintiff, upon information and belief, is a corporation organized under the laws of the State of New Jersey.

---

[1] Plaintiff also attempted to effect service of the Summons and Complaint on Fleet Capital Corporation's predecessor counsel on December 27, 2003, who did not have authority to accept service and did not accept service.

6. Fleet Capital Corporation is a corporation organized and existing under the laws of the State of Rhode Island with its principal place of business at 200 Glastonbury Blvd., Glastonbury, Connecticut.

7. Accordingly, there is complete diversity of citizenship between plaintiff and defendant.

8. Although the Complaint does not contain an explicit quantification of the monetary amount of plaintiff's demand, according to the allegations in the Complaint, plaintiff's claims relate to a credit facility involving approximately $1,750,000.00 and it is apparent that the amount in controversy exceeds the sum value of $75,000, exclusive of costs and interest.

9. Pursuant to 28 U.S.C. §1446(d), written notice of the filing of this Notice of Removal is being given to the plaintiff by serving a copy hereof upon his counsel by hand delivery. A copy of this Notice of Removal will be filed this day with the Clerk of the Superior Court of New Jersey, Bergen County.

10. The removal of this action to the United States District Court for the District of New Jersey does not waive defendant's ability to assert any defense in this action, including, but not limited to, defenses based upon jurisdiction, venue and insufficiency of service of process.

11. If any question arises as to the propriety of the removal of this action, defendant requests the opportunity to conduct limited discovery and to present a brief and oral argument in support of its position that this case is removable.

WHEREFORE, in accordance with the requirements of 28 U.S.C. § 1446, defendant removes this action from the Superior Court of New Jersey, Bergen County, to the United States District Court for the District of New Jersey.

Dated: January 27, 2003.

WOLFF & SAMSON PC

By: ______________________
ARMEN SHANINIAN (AS-8196)
Attorneys for Defendant

and

MAYER, BROWN, ROWE & MAW
Jean-Marie L. Atamian
Leslie E. Chebli
1675 Broadway
New York, New York 10019

Attorneys for Fleet Capital Corporation

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that I caused the within Notice of Removal to be filed with the Clerk of the Court of the United States District Court for the District of New Jersey and the Clerk of the Superior Court of New Jersey, Law Division, Bergen County, and to be served upon the attorneys for the plaintiffs by hand delivery on January 27, 2003.

WOLFF & SAMSON
Attorneys for Defendant

By: Ian S. Marx
IAN S. MARX

Dated: January 27, 2003



815605.01

SORIANO, HENKEL, SALERNO, BIEHL & MATTHEWS, P.C.
75 Eisenhower Parkway
Roseland, NJ 07068-1693
(973) 364-0111
Attorney for Plaintiff

| | |
|---|---|
| FARASH & ROBBINS, INC., a New Jersey corporation,<br><br>Plaintiff,<br><br>vs.<br><br>FLEET BANK f/k/a SUMMIT BANK,<br><br>Defendant. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: BERGEN COUNTY<br>DOCKET NO.: L-9999-02<br><br>**CIVIL ACTION** |

**The State of New Jersey, to the Above Named Defendant(s): Fleet Bank f/k/a Summit Bank**

The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (The address of each deputy clerk of the Superior Court is provided.) If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior court, Hughes Justice Complex, CN-971, Trenton, NJ 08625. A filing fee payable to the Clerk of the Superior Court and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $200.00 for Law Division and $200.00 for Chancery Division and completed Case Information Statement) if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford an attorney, you may call the Legal Services office in the county where you live. A list of these offices is provided. If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A list of these numbers is also provided.

DONALD F. PHELAN
Clerk of the Superior Court

DATED: December 26, 2002
Address of Defendant to be Served: Fleet Bank f/k/a Summit Bank, c/o James A. Dempsey, 136 Main Street, Suite 250, Princeton, New Jersey 08540.

**ATLANTIC COUNTY:**
Deputy Clerk of the Superior Court
Civil Division, Direct Filing
1201 Bacharach Blvd., First Fl.
Atlantic City, NJ 08401
LAWYER REFERRAL
(609) 345-3444
LEGAL SERVICES
(609) 348-4200

**BERGEN COUNTY:**
Deputy Clerk of the Superior Court
Case Processing Section, Room 119
Justice Center, 10 Main St.
Hackensack, NJ 07601-0769
LAWYER REFERRAL
(201) 488-0044
LEGAL SERVICES
(201) 487-2166

**BURLINGTON COUNTY:**
Deputy Clerk of the Superior Court
Central Processing Office
Attn: Judicial Intake, 1st Fl. Courts Facility
49 Rancocas Road
Mt. Holly, NJ 08060
LAWYER REFERRAL
(609) 261-4862
LEGAL SERVICES
(609) 261-1088

**CAMDEN COUNTY:**
Deputy Clerk of the Superior Court
Civil Processing Office
1st Fl., Hall of Records
Toms River, NJ 08754
LAWYER REFERRAL
(908) 240-3666
LEGAL SERVICES
(908) 341-2727

**CAPE MAY COUNTY:**
Deputy Clerk of the Superior Court
Central Processing Office
9 N. Main Street, Box DN-209
Cape May Court House, NJ 08210
LAWYER REFERRAL
(609) 463-0313
LEGAL SERVICES
(609) 465-3001

**CUMBERLAND COUNTY:**
Deputy Clerk of the Superior Court
Civil Case Management Office
Broad & Fayette Sts.
P.O. Box 615
Bridgeton, NJ 08302
LAWYER REFERRAL
(609) 692-6207
LEGAL SERVICES
(609) 451-0003

**ESSEX COUNTY:**
Deputy Clerk of the Superior Court
237 Hall of Records
465 Dr. Martin Luther King Jr. Blvd.
Newark, NJ 07102
LAWYER REFERRAL
(973) 622-6207
LEGAL SERVICES
(973) 624-4500

**GLOUCESTER COUNTY:**
Deputy Clerk of the Superior Court
Civil Case Management Office
Attn: Intake, First Fl., Court House
1 North Broad St., P.O. Box 129
Woodbury, NJ 08096
LAWYER REFERRAL
(609) 848-4589
LEGAL SERVICES
(609) 848-5360

**HUDSON COUNTY**
Deputy Clerk of the Superior Court
Superior Court, Civil Records Dept.
Brennan Court House, 1st Floor
583 Newark Avenue
Jersey City, NJ 07306
LAWYER REFERRAL
(201) 798-2727
LEGAL SERVICES
(201) 792-6363

**HUNTERDON COUNTY:**
Deputy Clerk of the Superior Court
Civil Division, 65 Park Avenue
Flemington, NJ 08862
LAWYER REFERRAL
(609) 735-2611
LEGAL SERVICES
(609) 782-7979

**MERCER COUNTY:**
Deputy Clerk of the Superior Court
Local Filing Office, Courthouse
175 South Broad St., P.O. Box 8068
Trenton, NJ 08650
LAWYER REFERRAL
(609) 585-6200
LEGAL SERVICES
(609) 695-6249

**MIDDLESEX COUNTY:**
Deputy Clerk of the Superior Court
Administration Building
Third Floor
1 Kennedy Sq., P.O. Box 2633
LAWYER REFERRAL
(908) 828-0053
LEGAL SERVICES
(908) 249-7600

**MONMOUTH COUNTY:**
Deputy Clerk of the Superior Court
71 Monument Park
P.O. Box 1262
Court House, East Wing
Freehold, NJ 07728-1262
LAWYER REFERRAL
(908) 431-5544
LEGAL SERVICES
(908) 866-0020

**MORRIS COUNTY:**
Deputy Clerk of the Superior Court
Civil Division
30 Schuyler Pl., P.O. Box 910
Morristown, NJ 07960-0910
LAWYER REFERRAL
(973) 267-5882
LEGAL SERVICES
(973) 285-6911

**OCEAN COUNTY:**
Deputy Clerk of the Superior Court
Court House, Room 119
118 Washington Street
Toms River, NJ 08754
LAWYER REFERRAL
(908) 240-3666
LEGAL SERVICES
(908) 341-2727

**PASSAIC COUNTY:**
Deputy Clerk of the Superior Court
Civil Division
Court House
77 Hamilton Street
Paterson, NJ 07505
LAWYER REFERRAL
(973) 278-9223
LEGAL SERVICES
(973) 345-7171

**SALEM COUNTY:**
Deputy Clerk of the Superior Court
92 Market St., P.O. Box 18
Salem, NJ 08079
LAWYER REFERRAL
(609) 678-8363
LEGAL SERVICES
(609) 451-0003

**SOMERSET COUNTY:**
Deputy Clerk of the Superior Court
Civil Division Office
New Court House, 3rd Fl.
P.O. Box 3000
Somerville, NJ 08876
LAWYER REFERRAL
(908) 685-2323
LEGAL SERVICES
(908) 231-0840

**SUSSEX COUNTY:**
Deputy Clerk of the Superior Court
Sussex County Judicial Center
43-47 High Street
Newton, NJ 07860
LAWYER REFERRAL
(973) 267-5882
LEGAL SERVICES
(973) 383-7400

**UNION COUNTY:**
Deputy Clerk of the Superior Court
1st Fl., Court House
2 Broad Street
Elizabeth, NJ 07207-6073
LAWYER REFERRAL
(908) 353-4715
LEGAL SERVICES
(908) 354-4340

**WARREN COUNTY:**
Deputy Clerk of the Superior Court
Civil Division Office
Court House
Belvidere, NJ 07823-1500
LAWYER REFERRAL
(908) 267-5882
LEGAL SERVICES
(908) 475-2010

SORIANO, HENKEL, SALERNO, BIEHL & MATTHEWS, P.C.
75 Eisenhower Parkway
Roseland, NJ 07068-1693
(973) 364-0111
Attorney for Plaintiff

DEC 1 ? 2002
DEPUTY CLERK

| | | |
|---|---|---|
| FARASH & ROBBINS, INC., a New Jersey corporation,<br><br>Plaintiff,<br><br>vs.<br><br>FLEET BANK f/k/a SUMMIT BANK,<br><br>Defendant. | : | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: BERGEN COUNTY<br>DOCKET NO.: L-9999-02<br><br>**CIVIL ACTION** |

## COMPLAINT

Farash & Robbins, Inc., a New Jersey corporation, with offices located at 40 Ruta Court, South Hackensack, New Jersey 07606, by way of complaint against the defendant, says:

**Parties**

1. Farash & Robbins, Inc. ("Farash"), is a New Jersey corporation, with offices located at 40 Ruta Court, South Hackensack, New Jersey 07606, which is engaged primarily in the wrist-watch business.

2. Summit Bank ("Summit"), a New Jersey Bank which was taken over by Fleet Bank ("Fleet") in or about 2001, was amongst other things, a commercial lender.

**Background**

3. On or about March 11, 1998, Farash borrowed certain funds from Summit. More specifically, Farash borrowed $250,000.00 pursuant to a term note, and $1,000,000.00 pursuant to a revolving line of credit.

4. The revolving line of credit provided a borrowing base as follows:

> "Borrowing Base" shall mean up to (a) 75% of the Borrower's Eligible Accounts Receivable from time to time outstanding less reserves with respect to such Accounts which the Bank may deem necessary in its sole and absolute discretion, plus up to (b) 40% of the value of the Borrower's Eligible Inventory from time to time on hand up to a maximum of $500,000.00 with respect to Eligible Inventory.

5. On or about October 13, 1998, Farash and Summit entered into a Loan Modification Agreement. The Loan Modification Agreement in material part (i) increased the revolving line of credit by $250,000.00 to $1,250,000.00; (ii) amended the Borrowing Base sublimit with respect to Eligible Inventory to $750,000.00 for up to six months per calendar year as required by the borrower, and $500,000.00 for the remainder of the calendar year; and (iii) indicated that the borrower provide Summit, within 15 days of the end of the previous month, a detailed listing and roll forward summary of the inventory on the borrower's books as of the close of the preceding month, and including quantities, values and location.

6. On or about March 27, 2000, Farash and Summit, entered into a second Loan Modification Agreement (the "2000 Loan Modification Agreement"). The 2000 Loan Modification Agreement in material part (i) increased the revolving line of credit another $250,000.00 to $1,500,000.00; (ii) increased the Borrowing Base sublimit to $1,250,000.00 year round; (iii) modified the Borrowing Base to mean up to (a) 80% of the Borrower's Eligible Accounts Receivable under 90 days from original invoice date, less reserves, plus up to 50% of the value of the Borrower's Eligible Inventory from time to time up to $1,250,00.00, and (iv) amended the agreement pertaining to field examinations, extending the requirement from two annual audits to a single, annual audit.

7. In or about January 2001, Fleet took over Summit and became the lender to Farash.

8. The loan officer at Summit Bank handling the Farash account was Al Casassis. In or around April 2001, Mr. Casassis introduced Robert Wainwright to Farash as the new loan officer from Fleet, who would be handling the Farash account.

9. Isidor Farash ("Dory") is the owner of Farash. Dory asked Mr. Wainwright if Fleet intended on making any changes to the existing agreement, that might effect Farash. Mr. Wainwright indicated Fleet has no plans to change the existing relationship. Wainwright in fact stated that his visits to customers were intended primarily to assure them that the Bank was to maintain the existing relationships going forward. Farash wanted to know if there was going to be any change in the relationship or if the relationship would be terminated. Farash wanted adequate notice to make arrangements with another commercial lender, if in fact the relationship with Fleet was going to change or be terminated.

10. As part of the loan agreement between Farash and Fleet, Farash had to submit to Fleet monthly borrowing certificates. Summit Bank's document was titled "Accounts Receivable and Inventory Borrowing Base Certificate". The document provided a formula whereupon Farash would insert its accounts receivable and inventory which would generate the amount that Farash could borrow monthly.

11. Without warning, justification or any reason whatsoever, Fleet changed the agreed limit of $1,250,000.00 to $625,000.00 for inventory as the maximum amount that could be borrowed by Farash from Fleet regarding inventory.

12. Margaret Shea was the employee at Fleet that indicated Fleet would not lend up to $1,250,000.00 on inventory, only up to $625,000.00 on inventory.

13. As a result of Fleet's actions, Farash lost $625,000.00 of borrowing capacity that it had available under its loan agreement, which was critical to Farash's operations.

14. Between June and August 2001, Dory brought to Mr. Wainwright's attention the problem with the borrowing base limit of $625,000.00 which was suppose to be $1,250,000.00.

15. Mr. Wainwright indicated that the sublimit is $625,000.00, not $1,250,000.00, but will review the agreement again and get back to Farash.

16. Dory did not hear back from Mr. Wainwright regarding the borrowing base limit for inventory.

17. Farash had the opportunity to secure a license to manufacture watches using the Puma trademark in July 2001. In order to get the license, Farash would need to invest funds to build Puma inventory for sale. Without the full $1,250,000.00 Farash was not capable of negotiating the Puma license.

18. In August 2001, Farash also commenced discussions with regard to securing an exclusive distributorship license agreement for FILA watches in the United States. FILA had been selling watches worldwide but did not have a US distributorship. In August 2001, Farash bought $160,000.00 worth of FILA watches for resale in the United States in order to encourage the commercial relationship between the parties.

19. FILA's payment terms to Farash were on open credit terms at 60 days, following receipt of the merchandise. As a result of Fleet's unilateral modification of the loan agreement, Farash could not pay the full bill to FILA when due, but paid it partially, and the balance over 3 months.

20. Subsequently, Farash was offered the FILA watch line as an exclusive U.S. Distributor, but had to post a letter of credit ("L/C") because Farash's open credit was no longer acceptable to FILA. Farash was unable to post an L/C, due to his diminished cash as result of Fleets actions. Moreover, L/C terms of payment would have significantly changed the nature of the

Distributorship, rendering the position far less commercially desirable.

21. On or about September 1, 2001, Dory left for Hong Kong for the annual trade fair and meeting with manufacturers.

22. On September 11, 2001, the United States was attacked by Al Queda, in both New York City and Washington, DC. Dory was to return home that day but obviously could not, as the entire U.S Airspace remained closed for several days.

23. On or about September 12, 2001, Robert Wainwright called Dory's office and indicated that he must have a meeting with him immediately. Dory was stuck in Hong Kong until about September 18, 2001. In his absence, Dory had his office return Wainwright's call and relayed the message that he could not yet return to the country. Dory called Mr. Wainwright upon his return. Mr. Wainwright indicated he must meet with him the next day.

24. The next day Mr. Wainwright arrived with his supervisor Mr. Devorn. Messrs. Wainwright and Devorn indicated that, starting immediately, there would be a weekly financial reporting requirement in lieu of the monthly reporting requirement specified in the loan documents. Farash was obviously uneasy about this demand as it would require significantly more resources to just comply on a clerical basis, but he also realized the deleterious effect it would have on Farash's cash availability.

25. Mr. Wainwright countered stating that the weekly reporting requirement was standard for Fleet borrowers.

26. Dory, at that point, again raised the issue of the $625,000.00 shortfall on the inventory borrowing base.

27. Dory asked for Fleet's reply to the borrowing base amount, which was to be $1,250,000.00, not $625,000.00. Mr. Devorn responded that if Farash wanted to open the question

of availability against inventory, the bank would bring in an appraiser, who might well conclude that the $625,000.00 amount presently made available, should be lowered, not raised. This threat was made for the sole purpose of discouraging Farash from requesting the full borrowing base of $1,250,000.00, to which he was contractually entitled.

28. The discussion over the accelerated reporting was not settled during that meeting. Rather, Farash was subjected to phone sessions whereby he was forced to agree to provide weekly collateral reports.

29. Dory was further told that if he continued objecting to the bank's various decisions, that the bank could and would begin to enforce the loan agreement, in a way which would make it impossible for Farash to comply with its terms.

30. Mr. Wainwright concluded these conversations by stating that Farash's business would in fact be enhanced through these changes and the changes would "flatten out the swings" in Farash's borrowing.

31. Under protest, Farash submitted the weekly reports starting November 1, 2002.

32. The adverse effects of Fleet making Farash report on a weekly borrowing base was to:

(a) greatly reduce cash availability with the same collateral and under the same contract;

(b) create a drastically increased workload for Farash, as well as a more hectic office environment, increased administrative costs; and

(c) made it exceedingly difficult, if not impossible, for Farash to forecast its cash requirements, thereby impairing Farash's ability to purchase inventory required by Farash to fulfill its contracts (and to solicit and be awarded new

contracts).

33. In November 2001, while Farash had to report weekly, in an effort to mitigate the damage caused by Fleet's unilateral reduction in credit, and having its cash availability significantly reduced, Farash applied for SBA Disaster Relief Funding, under a special section created by the U.S. Government to assist small businesses that were damaged from the September 11, 2001 terrorist attacks.

34. Farash was forced through its reduced credit line, to ship merchandise to its customers that reduced Farash's profit margin, which was a direct result of Farash's lowered cash availability. In essence, Farash was forced to ship more premium quality watches rather than the mix of watches that the contract required. Essentially, Farash was forced to deliver premium category watches for standard prices.

35. Farash's SBA application was approved in the amount of $530,000.00.

36. Upon review of the SBA loan documents, and through advice of consultants, Farash realized that Fleet's various and ongoing improper actions, resulted in an extremely volatile predicament, whereby, Farash could be easily placed in "default" of the SBA contract, at Fleet's sole, absolute and arbitrary discretion and also considering the various and numerous warnings, already threatened to Farash by Fleet. Accordingly, Farash could not execute the SBA contract and was prevented from closing on the new loan. It is also instructive to note that at several points during this SBA lending process, Farash delivered written requests for clarifications to Fleet, including one letter from Farash's attorney, that basically spelled out the entire situation in detail and requested a written reply urgently. All of these letters went unanswered, with the exception of a brief phone call from Bob Wainwright, telling Dory that he was "in left field". It is unclear what exactly was meant by this comment, except, to say that it was not intended to be encouraging.

37. From November 2001 through March 2002, Farash was restricted on the borrowing base to $625,000.00 and Fleet refused to reinstate the borrowing base at the contractual amount of $1,250,000.00. Fleet also continued to insist on weekly reports, although they were not required per the contract terms.

38. At various points, Farash was confronted by his bookkeeper with complaints from Fleet that Farash's reporting was incorrect or somehow improper. Dory wanted to know the exact nature of any discrepancies, to allow him to avoid the same problems going forward. Dory was also concerned that these discrepancies might in fact have been the result of Fleet following through with its earlier threat to find some reason to default Farash.

39. Upon Farash's inquiry, at this point, Mr. Wainwright called Dory with Mr. Devorn on the line, who stated that Farash should "start looking for another bank."

40. During the period where Fleet refused to reinstate the proper borrowing base at $1,250,000.00, and return to the contracted reporting schedule, Farash had the opportunity to secure licenses to manufacture watches under various well known brand names. However, Farash could not secure any of these licenses, because Farash did not have the cash availability, due to Fleet's breaches of the Agreement.

41. Farash had one last opportunity to secure the FILA distributorship in June of 2002, but was unable to do so, due to lack of cash and since FILA required either cash in advance or a letter of credit.

42. In approximately the same period, Starboard's relationship with Farash diminished as a result of Fleet's improper conduct.

43. In fact, Fleet's unilateral change to a weekly reporting schedule was not Fleet's standard reporting requirements.

44. As of October 1, 2002, when Farash learned that Fleet's weekly reporting requirement was not standard protocol for the bank, and was in fact reserved for only problem clients who had demonstrated either fraudulent reporting or drastic financial distress, Farash insisted that he be allowed to report monthly. The monthly requirement was detailed in his contract and the language was never changed.

45. On October 21, 2002, Fleet delivered a letter of termination to Farash, providing for 60 days notice of its demand to be repaid. At every stage, Fleet wasted little time in following through with its various ultimatums.

## FIRST COUNT

**(Breach of Contract)**

46. The above-described actions of defendant, including but not limited to, defendant's unilateral changes to contract terms, including a reduction in the authorized loan amount, increased reporting requirements, and threats to cancel the line without cause, are clear breaches of the terms of the contract between the parties, namely the March 27, 2000 contract.

47. Additionally, defendant and its representatives made assurances to plaintiff, that upon the transition of Summit Bank to Fleet Bank, all terms and procedures of the agreement and relationship would remain the same, therefore, there was no need for plaintiff to look elsewhere for a lender.

48. At all times mentioned herein, plaintiff performed according to the terms of the agreements between the parties. Defendant breached the agreements between the parties.

49. As a result of the breaches of the contracts between the parties by the defendant, plaintiff suffered damages, continues to suffer damages and will suffer damages in the future.

WHEREFORE, plaintiff demands judgment against the defendant for damages,

compensatory damages and punitive damages as well as counsel fees and cost of suit.

## SECOND COUNT

### (Negligent Misrepresentation)

50. Plaintiff incorporates the allegations of the First Count of the Complaint as if set forth at length herein.

51. In or around April 2001 as Summit Bank was transforming into Fleet Bank, a Fleet representative, Robert Wainwright, indicated to Farash that Fleet had no plans to change the terms of the existing relationship between Summit Bank and Farash. Specifically, as Mr. Wainwright visited Summit customers in anticipation of the transition, he indicated the visit was to assure them that the bank was going to maintain these existing relationships on a going forward basis.

52. Farash relied upon the negligent misrepresentations made by Robert Wainwright in deciding not to make arrangements with another commercial lender. Mr. Wainwright knew of this decision and justifiable reliance by Farash.

53. In fact, Fleet significantly changed the existing relationship between Summit and Farash to the detriment of Farash.

54. As a result of Farash's justifiable reliance upon the negligent misrepresentations of Fleet (via Mr .Wainwright), Farash was damaged.

WHEREFORE, plaintiff demands judgment against the defendant for damages, compensatory damages and punitive damages as well as counsel fees and cost of suit.

## THIRD COUNT

### (Breach of the Covenant of Good Faith and Fair Dealing)

55. Plaintiff incorporates the allegations of the First and Second Counts of the Complaint as if set forth at length herein.

56. Plaintiff and defendant's predecessor, Summit, agreed upon specific terms regarding, *inter alia*, lending money.

57. By operation of law, the parties' contract included the covenant of good faith and fair dealing.

58. At all times hereto Fleet breached the covenant of good faith and fair dealing because it, and its responsible employees, did not have an honest belief that good cause for unilaterally changing the terms of the agreement between the parties existed. Further, Fleet attempted to deprive the plaintiff of the benefit of its bargain as specified in the agreement between the parties for its own benefit.

59. As a result of the bad faith conduct of defendant, plaintiff was damaged.

**WHEREFORE,** plaintiff demands judgment against the defendant for damages, compensatory damages and punitive damages as well as counsel fees and cost of suit.

**FOURTH COUNT**

**(Consumer Fraud N.J.S.A. 56:8-2)**

60. Plaintiff incorporates the allegations of the First, Second and Third Counts of the Complaint as if set forth at length herein.

61. Defendant mislead, deceived and damaged plaintiff. By way of defendant's false promises, negligent misrepresentations, and the knowing, concealment, suppression and omission of material facts with regard to the way in which it would change the agreement between the parties.

62. Specifically, defendant's inducements to continue with them as they took over the business of Summit, were knowing misrepresentations of the pending course of events. In fact, after the transition, defendant reduced Farash's agreed lending limit of $1,250,000.00 to $625,000.00 for inventory. Additionally, Fleet required weekly reporting as opposed to the monthly reporting

requirement specified in the March 27, 2000 agreement between the parties.

63. Robert Wainwright represented that the weekly reporting requirements were standard for Fleet. Defendant made these false promises, pretenses and misrepresentations knowing that plaintiff would rely upon these concealments in connection with the subsequent performance of the agreement between the parties.

64. Accordingly, plaintiff suffered damages, will suffer damages and continues to suffer damages as described above.

WHEREFORE, plaintiff demands judgment against the defendant for damages, compensatory damages and punitive damages as well as counsel fees and cost of suit.

**FIFTH COUNT**

**(Common Law Fraud)**

65. Plaintiff incorporates the allegations of the First, Second and Third Counts of the Complaint as if set forth at length herein.

66. Defendant mislead, deceived and damaged plaintiff. By way of defendant's false promises, negligent misrepresentations, and the knowing, concealment, suppression and omission of material facts with regard to the way in which it would change the agreement between the parties.

67. Specifically, defendant's inducements to continue with them as they took over the business of Summit, were knowing misrepresentations of the pending course of events. In fact, after the transition, defendant reduced Farash's agreed lending limit of $1,250,000.00 to $625,000.00 for inventory. Additionally, Fleet required weekly reporting as opposed to the monthly reporting requirement specified in the March 27, 2000 agreement between the parties.

68. Robert Wainwright represented that the weekly reporting requirements were standard for Fleet. Defendant made these false promises, pretenses and misrepresentations knowing that

plaintiff would rely upon these concealments in connection with the subsequent performance of the agreement between the parties.

69. Accordingly, plaintiff suffered damages, will suffer damages and continues to suffer damages as described above.

**WHEREFORE,** plaintiff demands judgment against the defendant for damages, compensatory damages and punitive damages as well as counsel fees and cost of suit.

**SIXTH COUNT**

**(Quantum Meruit)**

70. Plaintiff incorporates the allegations of the First, Second, Third and Fourth Counts of the Complaint as if set forth at length herein.

71. At all times herein, plaintiff made interest payments to defendant.

72. Had plaintiff properly been advised that defendant would be breaching the agreement, unilaterally changing the terms of the agreement, and subsequently canceling the agreement, plaintiff would not have made the interest payments to defendant but would have sought another lender.

73. As a result of the improper and bad faith conduct by defendant, defendant was unjustly enriched to the detriment of plaintiff.

**WHEREFORE,** plaintiff demands judgment against the defendant for damages, compensatory damages and punitive damages as well as counsel fees and cost of suit.

SORIANO, HENKEL, SALERNO, BIEHL
AND MATTHEWS, P.C.

BY: Frederick C. Biehl, III

DATED: December 16, 2002

**JURY DEMAND**

Plaintiff hereby demands a jury trial as to all issues triable by a jury.

Frederick C. Biehl, III

DATED: December 16, 2002

**4:5-1 CERTIFICATION**

I certify that based upon the information currently in my possession, the matter in controversy is not the subject of any other action pending in any court or of a pending arbitration proceeding and, at this time, no other action or arbitration proceeding is contemplated. At this time, I know of no other persons who should be joined in this action.

Frederick C. Biehl, III

DATED: December 16, 2002

**DESIGNATION OF TRIAL COUNSEL**

Pursuant to Rule 4:25-4, Frederick C. Biehl, III, Esq. is hereby designated as trial counsel for Plaintiff in the within matter.

Frederick C. Biehl, III

DATED: December 16, 2002

CIVIL CASE INFORMATION STATEMENT
(CIS)

Use for initial pleadings (not motions) under Rule 4:5-1
Pleadings will be rejected for filing, under Rule 1:5-6(c), if information above the black bar is not completed or if attorneys's signature is not affixed.

FOR USE BY CLERK'S OFFICE ONLY
Payment Type: CK CG CA
CHG/CK NO.
AMOUNT:
OVERPAYMENT:
BATCHNUMBER

ATTORNEY/PRO SE NAME: Frederick C. Biehl, III

TELEPHONE NUMBER: (973) 364-0111

COUNTY OF VENUE: Bergen

FIRM NAME (If applicable): Soriano, Henkel, Salerno, Biehl & Matthews, P.C.

DOCKET NO. (When available)

OFFICE ADDRESS: 75 Eisenhower Parkway, Roseland, New Jersey 07068-1693

DOCUMENT TYPE: COMPLAINT

JURY DEMAND YES X NO

NAME OF PARTY (e.g. John Doe, Plaintiff): Farash & Robbins, Inc., Plaintiff

CAPTION: Farash & Robbins, Inc. v. Fleet Bank f/k/a Summit Bank

CASE TYPE NUMBER: 599

IS THIS A PROFESSIONAL MALPRACTICE CASE? _ Yes X No
IF YOU HAVE CHECKED "YES" SEE N.J.S.A. 2A:53A-27 AND APPLICABLE CASE LAW REGARDING YOUR OBLIGATION TO FILE AN AFFIDAVIT OF MERIT.

RELATED CASES PENDING? _Yes X No

IF YES, LIST DOCKET NUMBERS

DO YOU ANTICIPATE ADDING ANY PARTIES (ARISING OUT OF SAME TRANSACTION OR OCCURRENCE)? _ Yes X No

NAME OF DEFENDANT'S PRIMARY INSURANCE COMPANY, IF KNOWN: NONE UNKNOWN

THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE

CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

A. DO PARTIES HAVE A CURRENT PAST OR RECURRENT RELATIONSHIP? X YES ___NO

IF YES, IS THAT RELATIONSHIP ___EMPLOYER-EMPLOYEE ___FRIEND/NEIGHBOR ___ OTHER (explain) ___FAMILIAL X BUSINESS

B. DOES THE STATUTE GOVERNING THIS CASE PROVIDE FOR PAYMENT OF FEES BY THE LOSING PARTY? _YES X NO

USE THIS SPACE TO ALERT THE COURT TO ANY SPECIAL CASE CHARACTERISTICS THAT MAY WARRANT INDIVIDUAL MANAGEMENT OR ACCELERATED DISPOSITION:

DO YOU OR YOUR CLIENT NEED ANY DISABILITY ACCOMMODATIONS? _ Yes X No IF YES, PLEASE IDENTIFY THE REQUESTED ACCOMMODATION: ___

WILL AN INTERPRETER BE NEEDED? _ Yes X No IF YES, FOR WHAT LANGUAGE: ___

ATTORNEY SIGNATURE

[signature]

FARASH & ROBBINS, INC.
Plaintiff
vs.
FLEET BANK
Defendant

Superior Court of New Jers
Ven
Docket Number: BER L 9999 (

Person to be served (Name and Address):
FLEET BANK F/K/A SUMMIT BANK
156 EAGLE ROCK AVE
ROSELAND NJ 07068
By serving: FLEET BANK F/K/A SUMMIT BANK

# AFFIDAVIT OF SERVICE
(For Use by Private Service)

Attorney: FREDERICK C. BIEHL, ESQ.

Cost of Service pursuant to R. 4:4-3(c)
$ ______

Papers Served: Summons and Complaint, Certification, CIS

**Service Data:**
[X] Served Successfully [ ] Not Served
Date: 1/6/03 Time: 9:00 AM

[ ] Delivered a copy to him/her personally

[ ] Left a copy with a competent household member over 14 years of age residing therein (indicate name & relationship at right)

[X] Left a copy with a person authorized to accept service, e.g. managing agent, registered agent, etc. (indicate name & official title at right)

Attempts: Date: __/__/__ Time: __:__ M
Date: __/__/__ Time: __:__ M
Date: __/__/__ Time: __:__ M

Name of Person Served and relationship/title:
Shubham Madhavan Asst.
Asst. Branch Manager

**Description of Person Accepting Service:**
Sex: M Age: 50-55 Height: 5'6" Weight: 180 lbs. Skin Color: B-Indian Hair Color: S/P

**Unserved:**
[ ] Defendant is unknown at the address furnished by the attorney
[ ] All reasonable inquiries suggest defendant moved to an undetermined address
[ ] No such street in municipality
[ ] No response on: __/__/__ Time: __:__ M
__/__/__ Time: __:__ M
__/__/__ Time: __:__ M
[ ] Other: ______ Comments or Remarks ______

**Served Data:**
Subscribed and Sworn to me this
6 day of Jan, 2003
Notary Signature: Janira S. Velez
JANIRA SANTIAGO VELEZ
NOTARY PUBLIC OF NEW JERSEY
Name of Notary Commission Expiration
My Commission Exp. April 24, 2007

I, Donald Martin,
was at the time of service a competent adult not having a direct interest in the litigation.
I declare under penalty of perjury that the foregoing is true and correct.

Donald Martin 1/6/03
Signature of Process Server Date

Name of Private Server: Donald Martin Address: 2009 Morris Avenue UNION, NJ 07083 Phone: (908) 687-0056