11

SORIANO, HENKEL, SALERNO, BIEHL & MATTHEWS, P.C.
75 Eisenhower Parkway
Roseland, NJ 07068-1693
(973) 364-0111
Attorney for Plaintiff

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| FARASH & ROBBINS, INC., a New Jersey corporation, | : | HONORABLE DENNIS M. CAVENAUGH |
| Plaintiff, | : | CIVIL ACTION NO: 03-CV-361 |
| vs. | : | |
| SUMMIT BUSINESS CAPITAL CORPORATION and FLEET CAPITAL CORPORATION, | : | |
| Defendant. | : | |

# FIRST AMENDED COMPLAINT

Farash & Robbins, Inc., a New Jersey corporation, with offices located at 40 Ruta Court, South Hackensack, New Jersey 07606, by way of complaint against the defendant, says:

## Parties

1. Farash & Robbins, Inc. ("Farash"), is a New Jersey corporation, with offices located at 40 Ruta Court, South Hackensack, New Jersey 07606, which is engaged primarily in the wrist-watch business.

2. Summit Business Capital Corporation ("Summit"), a New Jersey Bank which was taken over by Fleet Bank ("Fleet") in or about 2001, was amongst other things, a commercial lender.

## Background

3. On or about March 11, 1998, Farash borrowed certain funds from Summit. More specifically, Farash borrowed $250,000.00 pursuant to a term note, and $1,000,000.00 pursuant to

a revolving line of credit.

4. The revolving line of credit provided a borrowing base as follows:

> "Borrowing Base" shall mean up to (a) 75% of the Borrower's Eligible Accounts Receivable from time to time outstanding less reserves with respect to such Accounts which the Bank may deem necessary in its sole and absolute discretion, plus up to (b) 40% of the value of the Borrower's Eligible Inventory from time to time on hand up to a maximum of $500,000.00 with respect to Eligible Inventory.

5. On or about October 13, 1998, Farash and Summit entered into a Loan Modification Agreement. The Loan Modification Agreement in material part (i) increased the revolving line of credit by $250,000.00 to $1,250,000.00; (ii) amended the Borrowing Base sublimit with respect to Eligible Inventory to $750,000.00 for up to six months per calendar year as required by the borrower, and $500,000.00 for the remainder of the calendar year; and (iii) indicated that the borrower provide Summit, within 15 days of the end of the previous month, a detailed listing and roll forward summary of the inventory on the borrower's books as of the close of the preceding month, and including quantities, values and location.

6. On or about March 27, 2000, Farash and Summit entered into a second Loan Modification Agreement (the "2000 Loan Modification Agreement"). The 2000 Loan Modification Agreement in material part (i) increased the revolving line of credit another $250,000.00 to $1,500,000.00; (ii) increased the Borrowing Base sublimit to $1,250,000.00 year round; (iii) modified the Borrowing Base to mean up to (a) 80% of the Borrower's Eligible Accounts Receivable under 90 days from original invoice date, less reserves, plus up to 50% of the value of the Borrower's Eligible Inventory from time to time up to $1,250,00.00, and (iv) amended the agreement pertaining to field examinations, extending the requirement from two annual audits to a single, annual audit.

7. In or about January 2001, Fleet took over Summit and became the lender to Farash.

8. The loan officer at Summit Bank handling the Farash account was Al Casassis. In or around April 2001, Mr. Casassis introduced Robert Wainwright to Farash as the new loan officer from Fleet, who would be handling the Farash account.

9. Isidor Farash ("Dory") is the owner of Farash. Dory asked Mr. Wainwright if Fleet intended on making any changes to the existing agreement, that might effect Farash. Mr. Wainwright indicated Fleet has no plans to change the existing relationship. Wainwright in fact stated that his visits to customers were intended primarily to assure them that the Bank was to maintain the existing relationships going forward. Farash wanted to know if there was going to be any change in the relationship or if the relationship would be terminated. Farash wanted adequate notice to make arrangements with another commercial lender, if in fact the relationship with Fleet was going to change or be terminated.

10. As part of the loan agreement between Farash and Fleet, Farash had to submit to Fleet monthly borrowing certificates. Summit Bank's document was titled "Accounts Receivable and Inventory Borrowing Base Certificate". The document provided a formula whereupon Farash would insert its accounts receivable and inventory which would generate the amount that Farash could borrow monthly.

11. Without warning, justification or any reason whatsoever, Fleet changed the agreed limit of $1,250,000.00 to $625,000.00 for inventory as the maximum amount that could be borrowed by Farash from Fleet regarding inventory.

12. Margaret Shea was the employee at Fleet that indicated Fleet would not lend up to $1,250,000.00 on inventory, only up to $625,000.00 on inventory.

13. As a result of Fleet's actions, Farash lost $625,000.00 of borrowing capacity that it

had available under its loan agreement, which was critical to Farash's operations.

14. Between June and August 2001, Dory brought to Mr. Wainwright's attention the problem with the borrowing base limit of $625,000.00 which was suppose to be $1,250,000.00.

15. Mr. Wainwright indicated that the sublimit is $625,000.00, not $1,250,000.00, but will review the agreement again and get back to Farash.

16. Dory did not hear back from Mr. Wainwright regarding the borrowing base limit for inventory.

17. Farash had the opportunity to secure a license to manufacture watches using the Puma trademark in July 2001. In order to get the license, Farash would need to invest funds to build Puma inventory for sale. Without the full $1,250,000.00 Farash was not capable of negotiating the Puma license.

18. In August 2001, Farash also commenced discussions with regard to securing an exclusive distributorship license agreement for FILA watches in the United States. FILA had been selling watches worldwide but did not have a US distributorship. In August 2001, Farash bought $160,000.00 worth of FILA watches for resale in the United States in order to encourage the commercial relationship between the parties.

19. FILA's payment terms to Farash were on open credit terms at 60 days, following receipt of the merchandise. As a result of Fleet's unilateral modification of the loan agreement, Farash could not pay the full bill to FILA when due, but paid it partially, and the balance over 3 months.

20. Subsequently, Farash was offered the FILA watch line as an exclusive U.S. Distributor, but had to post a letter of credit ("L/C") because Farash's open credit was no longer acceptable to FILA. Farash was unable to post an L/C, due to his diminished cash as result of Fleets

actions. Moreover, L/C terms of payment would have significantly changed the nature of the Distributorship, rendering the position far less commercially desirable.

21. On or about September 1, 2001, Dory left for Hong Kong for the annual trade fair and meeting with manufacturers.

22. On September 11, 2001, the United States was attacked by Al Queda, in both New York City and Washington, DC. Dory was to return home that day but obviously could not, as the entire U.S Airspace remained closed for several days.

23. On or about September 12, 2001, Robert Wainwright called Dory's office and indicated that he must have a meeting with him immediately. Dory was stuck in Hong Kong until about September 18, 2001. In his absence, Dory had his office return Wainwright's call and relayed the message that he could not yet return to the country. Dory called Mr. Wainwright upon his return. Mr. Wainwright indicated he must meet with him the next day.

24. The next day Mr. Wainwright arrived with his supervisor Mr. Devorn. Messrs. Wainwright and Devorn indicated that, starting immediately, there would be a weekly financial reporting requirement in lieu of the monthly reporting requirement specified in the loan documents. Farash was obviously uneasy about this demand as it would require significantly more resources to just comply on a clerical basis, but he also realized the deleterious effect it would have on Farash's cash availability.

25. Mr. Wainwright countered stating that the weekly reporting requirement was standard for Fleet borrowers.

26. Dory, at that point, again raised the issue of the $625,000.00 shortfall on the inventory borrowing base.

27. Dory asked for Fleet's reply to the borrowing base amount, which was to be

$1,250,000.00, not $625,000.00. Mr. Devorn responded that if Farash wanted to open the question of availability against inventory, the bank would bring in an appraiser, who might well conclude that the $625,000.00 amount presently made available, should be lowered, not raised. This threat was made for the sole purpose of discouraging Farash from requesting the full borrowing base of $1,250,000.00, to which he was contractually entitled.

28. The discussion over the accelerated reporting was not settled during that meeting. Rather, Farash was subjected to phone sessions whereby he was forced to agree to provide weekly collateral reports.

29. Dory was further told that if he continued objecting to the bank's various decisions, that the bank could and would begin to enforce the loan agreement, in a way which would make it impossible for Farash to comply with its terms.

30. Mr. Wainwright concluded these conversations by stating that Farash's business would in fact be enhanced through these changes and the changes would "flatten out the swings" in Farash's borrowing.

31. Under protest, Farash submitted the weekly reports starting November 1, 2002.

32. The adverse effects of Fleet making Farash report on a weekly borrowing base was to:

(a) greatly reduce cash availability with the same collateral and under the same contract;

(b) create a drastically increased workload for Farash, as well as a more hectic office environment, increased administrative costs; and

(c) made it exceedingly difficult, if not impossible, for Farash to forecast its cash requirements, thereby impairing Farash's ability to purchase inventory

required by Farash to fulfill its contracts (and to solicit and be awarded new contracts).

33. In November 2001, while Farash had to report weekly, in an effort to mitigate the damage caused by Fleet's unilateral reduction in credit, and having its cash availability significantly reduced, Farash applied for SBA Disaster Relief Funding, under a special section created by the U.S. Government to assist small businesses that were damaged from the September 11, 2001 terrorist attacks.

34. Farash was forced through its reduced credit line, to ship merchandise to its customers that reduced Farash's profit margin, which was a direct result of Farash's lowered cash availability. In essence, Farash was forced to ship more premium quality watches rather than the mix of watches that the contract required. Essentially, Farash was forced to deliver premium category watches for standard prices.

35. Farash's SBA application was approved in the amount of $530,000.00.

36. Upon review of the SBA loan documents, and through advice of consultants, Farash realized that Fleet's various and ongoing improper actions, resulted in an extremely volatile predicament, whereby, Farash could be easily placed in "default" of the SBA contract, at Fleet's sole, absolute and arbitrary discretion and also considering the various and numerous warnings, already threatened to Farash by Fleet. Accordingly, Farash could not execute the SBA contract and was prevented from closing on the new loan. It is also instructive to note that at several points during this SBA lending process, Farash delivered written requests for clarifications to Fleet, including one letter from Farash's attorney, that basically spelled out the entire situation in detail and requested a written reply urgently. All of these letters went unanswered, with the exception of a brief phone call from Bob Wainwright, telling Dory that he was "in left field". It is unclear what

exactly was meant by this comment, except, to say that it was not intended to be encouraging.

37. From November 2001 through March 2002, Farash was restricted on the borrowing base to $625,000.00 and Fleet refused to reinstate the borrowing base at the contractual amount of $1,250,000.00. Fleet also continued to insist on weekly reports, although they were not required per the contract terms.

38. At various points, Farash was confronted by his bookkeeper with complaints from Fleet that Farash's reporting was incorrect or somehow improper. Dory wanted to know the exact nature of any discrepancies, to allow him to avoid the same problems going forward. Dory was also concerned that these discrepancies might in fact have been the result of Fleet following through with its earlier threat to find some reason to default Farash.

39. Upon Farash's inquiry, at this point, Mr. Wainwright called Dory with Mr. Devorn on the line, who stated that Farash should "start looking for another bank."

40. During the period where Fleet refused to reinstate the proper borrowing base at $1,250,000.00, and return to the contracted reporting schedule, Farash had the opportunity to secure licenses to manufacture watches under various well known brand names. However, Farash could not secure any of these licenses, because Farash did not have the cash availability, due to Fleet's breaches of the Agreement.

41. Farash had one last opportunity to secure the FILA distributorship in June of 2002, but was unable to do so, due to lack of cash and since FILA required either cash in advance or a letter of credit.

42. In approximately the same period, Starboard's relationship with Farash diminished as a result of Fleet's improper conduct.

43. In fact, Fleet's unilateral change to a weekly reporting schedule was not Fleet's

standard reporting requirements.

44. As of October 1, 2002, when Farash learned that Fleet's weekly reporting requirement was not standard protocol for the bank, and was in fact reserved for only problem clients who had demonstrated either fraudulent reporting or drastic financial distress, Farash insisted that he be allowed to report monthly. The monthly requirement was detailed in his contract and the language was never changed.

45. On October 21, 2002, Fleet delivered a letter of termination to Farash, providing for 60 days notice of its demand to be repaid. At every stage, Fleet wasted little time in following through with its various ultimatums.

**FIRST COUNT**

**(Breach of Contract)**

46. The above-described actions of defendant, including but not limited to, defendant's unilateral changes to contract terms, including a reduction in the authorized loan amount, increased reporting requirements, and threats to cancel the line without cause, are clear breaches of the terms of the contract between the parties, namely the March 27, 2000 contract.

47. Additionally, defendants and their representatives made assurances to plaintiff, that upon the transition of Summit Bank to Fleet Bank, all terms and procedures of the agreement and relationship would remain the same, therefore, there was no need for plaintiff to look elsewhere for a lender.

48. At all times mentioned herein, plaintiff performed according to the terms of the agreements between the parties. Defendants breached the agreements between the parties.

49. As a result of the breaches of the contracts between the parties by the defendants, plaintiff suffered damages, continues to suffer damages and will suffer damages in the future.

**WHEREFORE,** plaintiff demands judgment against the defendants for damages, compensatory damages and punitive damages as well as counsel fees and cost of suit.

## SECOND COUNT

### (Negligent Misrepresentation)

50. Plaintiff incorporates the allegations of the First Count of the Complaint as if set forth at length herein.

51. In or around April 2001 as Summit Bank was transforming into Fleet Bank, a Fleet representative, Robert Wainwright, indicated to Farash that Fleet had no plans to change the terms of the existing relationship between Summit Bank and Farash. Specifically, as Mr. Wainwright visited Summit customers in anticipation of the transition, he indicated the visit was to assure them that the bank was going to maintain these existing relationships on a going forward basis.

52. Farash relied upon the negligent misrepresentations made by Robert Wainwright in deciding not to make arrangements with another commercial lender. Mr. Wainwright knew of this decision and justifiable reliance by Farash.

53. In fact, Fleet significantly changed the existing relationship between Summit and Farash to the detriment of Farash.

54. As a result of Farash's justifiable reliance upon the negligent misrepresentations of Fleet (via Mr .Wainwright), Farash was damaged.

**WHEREFORE,** plaintiff demands judgment against the defendants for damages, compensatory damages and punitive damages as well as counsel fees and cost of suit.

## THIRD COUNT

### (Breach of the Covenant of Good Faith and Fair Dealing)

55. Plaintiff incorporates the allegations of the First and Second Counts of the Complaint

as if set forth at length herein.

56. Plaintiff, Summit, agreed upon specific terms regarding, *inter alia,* lending money.

57. By operation of law, the parties' contract included the covenant of good faith and fair dealing.

58. At all times hereto defendants breached the covenant of good faith and fair dealing because they, and their responsible employees, did not have an honest belief that good cause for unilaterally changing the terms of the agreement between the parties existed. Further, defendants attempted to deprive the plaintiff of the benefit of its bargain as specified in the agreement between the parties for its own benefit.

59. As a result of the bad faith conduct of defendants, plaintiff was damaged.

**WHEREFORE,** plaintiff demands judgment against the defendants for damages, compensatory damages and punitive damages as well as counsel fees and cost of suit.

**<u>FOURTH COUNT</u>**

**(Consumer Fraud N.J.S.A. 56:8-2)**

60. Plaintiff incorporates the allegations of the First, Second and Third Counts of the Complaint as if set forth at length herein.

61. Defendants misled, deceived and damaged plaintiff. By way of defendant's false promises, negligent misrepresentations, and the knowing, concealment, suppression and omission of material facts with regard to the way in which it would change the agreement between the parties.

62. Specifically, defendant's inducements to continue with them as Fleet took over the business of Summit, were knowing misrepresentations of the pending course of events. In fact, after the transition, defendants reduced Farash's agreed lending limit of $1,250,000.00 to $625,000.00 for inventory. Additionally, Fleet required weekly reporting as opposed to the monthly reporting

requirement specified in the March 27, 2000 agreement between the parties.

63. Robert Wainwright represented that the weekly reporting requirements were standard for Fleet. Defendant made these false promises, pretenses and misrepresentations knowing that plaintiff would rely upon these concealments in connection with the subsequent performance of the agreement between the parties.

64. Accordingly, plaintiff suffered damages, will suffer damages and continues to suffer damages as described above.

**WHEREFORE,** plaintiff demands judgment against the defendants for damages, compensatory damages and punitive damages as well as counsel fees and cost of suit.

**FIFTH COUNT**

**(Common Law Fraud)**

65. Plaintiff incorporates the allegations of the First, Second, Third and Fourth Counts of the Complaint as if set forth at length herein.

66. Defendants misled, deceived and damaged plaintiff by way of false promises, negligent misrepresentations, and the knowing, concealment, suppression and omission of material facts with regard to the way in which it would change the agreement between the parties.

67. Specifically, defendant's inducements to continue with them as Fleet took over the business of Summit, were knowing misrepresentations of the pending course of events. In fact, after the transition, Fleet reduced Farash's agreed lending limit of $1,250,000.00 to $625,000.00 for inventory. Additionally, Fleet required weekly reporting as opposed to the monthly reporting requirement specified in the March 27, 2000 agreement between the parties.

68. Robert Wainwright represented that the weekly reporting requirements were standard for Fleet. Defendant made these false promises, pretenses and misrepresentations knowing that

plaintiff would rely upon these concealments in connection with the subsequent performance of the agreement between the parties.

69. Accordingly, plaintiff suffered damages, will suffer damages and continues to suffer damages as described above.

**WHEREFORE,** plaintiff demands judgment against the defendants for damages, compensatory damages and punitive damages as well as counsel fees and cost of suit.

## SIXTH COUNT

## (Quantum Meruit)

70. Plaintiff incorporates the allegations of the First, Second, Third and Fourth Counts of the Complaint as if set forth at length herein.

71. At all times herein, plaintiff made interest payments to defendants.

72. If plaintiff had been advised properly that defendants would be breaching the agreement, unilaterally changing the terms of the agreement, and subsequently canceling the agreement, plaintiff would not have made the interest payments to defendants but would have sought another lender.

73. As a result of the improper and bad faith conduct by defendants, defendants were unjustly enriched to the detriment of plaintiff.

**WHEREFORE,** plaintiff demands judgment against the defendants for damages, compensatory damages and punitive damages as well as counsel fees and cost of suit.

SORIANO, HENKEL, SALERNO, BIEHL
AND MATTHEWS, P.C.

BY: ______________________
Frederick C. Biehl, III

DATED: January 31, 2003

**JURY DEMAND**

Plaintiff hereby demands a jury trial as to all issues triable by a jury.

Frederick C. Biehl, III

DATED: January 31, 2003

**4:5-1 CERTIFICATION**

I certify that based upon the information currently in my possession, the matter in controversy is not the subject of any other action pending in any court or of a pending arbitration proceeding and, at this time, no other action or arbitration proceeding is contemplated. At this time, I know of no other persons who should be joined in this action.

Frederick C. Biehl, III

DATED: January 31, 2003

**DESIGNATION OF TRIAL COUNSEL**

Pursuant to Rule 4:25-4, Frederick C. Biehl, III, Esq. is hereby designated as trial counsel for Plaintiff in the within matter.

Frederick C. Biehl, III

DATED: January 31, 2003