RECEIVED
MAR 6 2003
AT 8:30 ________M
WILLIAM T. WALSH, CLERK

FREDERICK C. BIEHL, III, ESQ. (#8557)
SORIANO, HENKEL, SALERNO, BIEHL & MATTHEWS, P.C.
75 Eisenhower Parkway
Roseland, NJ 07068-1693
(973) 364-0111
Attorney for Plaintiff

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

FARASH & ROBBINS, INC., a New Jersey corporation,

Plaintiff,

vs.

FLEET NATIONAL BANK, AS SUCCESSOR OF SUMMIT BANK,

Defendant.

HONORABLE DENNIS M. CAVENAUGH

CIVIL ACTION NO: 03-CV-361

FILED
MAR 6 2002
AT 8:30 ________M
WILLIAM T. WALSH, CLERK

**SECOND AMENDED COMPLAINT**

Farash & Robbins, Inc., a New Jersey corporation, with offices located at 40 Ruta Court, South Hackensack, New Jersey 07606, by way of complaint against the defendant, says:

**Parties**

1. Farash & Robbins, Inc. ("Farash"), is a New Jersey corporation, with offices located at 40 Ruta Court, South Hackensack, New Jersey 07606. Farash is engaged primarily in the wrist-watch business.

2. Summit Bank ("Summit"), a New Jersey Bank, which was taken over by Fleet National Bank ("Fleet") in or about March 2001, was amongst other things, a commercial lender.

**Background**

3. On or about March 11, 1998, Farash borrowed certain funds from Summit. More specifically, Farash borrowed $250,000.00 pursuant to a term note, and $1,000,000.00 pursuant to

a revolving line of credit.

4. The revolving line of credit provided a borrowing base as follows:

> "Borrowing Base" shall mean up to (a) 75% of the Borrower's Eligible Accounts Receivable from time to time outstanding less reserves with respect to such Accounts which the Bank may deem necessary in its sole and absolute discretion, plus up to (b) 40% of the value of the Borrower's Eligible Inventory from time to time on hand up to a maximum of $500,000.00 with respect to Eligible Inventory.

5. On or about October 13, 1998, Farash and Summit entered into a Loan Modification Agreement. The Loan Modification Agreement in material part (i) increased the revolving line of credit by $250,000.00 to $1,250,000.00; (ii) amended the Borrowing Base sublimit with respect to Eligible Inventory to $750,000.00 for up to six months per calendar year as required by the borrower, and $500,000.00 for the remainder of the calendar year; and (iii) indicated that the borrower provide Summit, within 15 days of the end of the previous month, a detailed listing and roll forward summary of the inventory on the borrower's books as of the close of the preceding month, and include quantities, values and location.

6. On or about March 27, 2000, Farash and Summit entered into a second Loan Modification Agreement (the "2000 Loan Modification Agreement"). The 2000 Loan Modification Agreement in material part (i) increased the revolving line of credit another $250,000.00 to $1,500,000.00; (ii) increased the Borrowing Base sublimit to $1,250,000.00 year round; (iii) modified the Borrowing Base to mean up to (a) 80% of the Borrower's Eligible Accounts Receivable under 90 days from original invoice date, less reserves, plus up to 50% of the value of the Borrower's Eligible Inventory from time to time up to $1,250,00.00, and (iv) amended the agreement pertaining to field examinations, by reducing the requirement from two annual audits to a single, annual audit.

7. In or about March 2001, Fleet took over Summit and became the lender to Farash.

8. The loan officer at Summit Bank handling the Farash account was Al Cassasus. In or around April 2001, Mr. Cassasus introduced Robert Wainwright to Farash as the new loan officer from Fleet who would be handling the Farash account.

9. Isidor Farash ("Dory") is the owner of Farash. Dory asked Mr. Wainwright if Fleet intended on making any changes to the existing agreement that might effect Farash. Farash wanted certain assurances from Fleet because Farash previously had its lender taken over by Fleet which resulted in litigation. More specifically, in or about 1995, Farash had its banking relationship with Citizens First Bank ("Citizens"). Fleet Bank bought Citizens and became Farash's lender. Shortly thereafter, Fleet unilaterally and improperly dishonored five of Farash's checks to its suppliers. The checks total several hundred thousand dollars. Fleet dishonored the checks without notification to Farash that it had frozen Farash's assets. Farash was forced to bring suit against Fleet in the Bergen County Superior Court, Docket No. BER-L-7964-96. Ultimately, the Bergen County Superior Court ordered Fleet to release any freeze on the Farash accounts and return the money in the account to Farash. Farash also claimed that it suffered damages as a result of Fleet's improper conduct in dishonoring Farash's checks and denying Farash use of its money. Fleet settled the lawsuit and paid Farash $42,000.00 in damages on October 16, 1998. Mr. Wainwright indicated Fleet has no plans to change the existing relationship. Wainwright in fact stated that his visits to customers were intended primarily to assure them that Fleet would maintain the existing relationships going forward. He further indicated that the lending facility would remain unchanged. Farash wanted to know if there was going to be any change in the relationship, if the relationship would be terminated or if the lending facility was going to change. Farash wanted adequate notice to make arrangements with another commercial lender, if in fact the relationship with Fleet was going to change, be terminated

or if the lending terms were going to change. Fleet's senior loan officers made representations that no such change was going to occur. However, Fleet had already decided to make substantial changes in the relationship and was going to implement same forthwith. Fleet did not want to disclose these changes at that time because they did not want a mass exodus of customers going to other lenders upon its acquisition of Summit. As a result of Fleet's representations Farash did not seek alternative financing. Farash relied to its detriment on the representations of the Fleet loan officers. Farash felt it was reasonable to rely on such representations made as they were made by Fleet senior loan officers and vice presidents of the bank.

10. As part of the loan agreement between Farash and Summit, Farash had to submit to Summit monthly borrowing certificates. Summit Bank's document was titled "Accounts Receivable and Inventory Borrowing Base Certificate". The document provided a formula whereupon Farash would insert its accounts receivable and inventory which would generate the amount that Farash could borrow monthly.

11. Without warning, justification or any reason whatsoever, Fleet unilaterally changed the agreed limit of $1,250,000.00 to $625,000.00 for inventory as the maximum amount that could be borrowed by Farash from Fleet regarding inventory.

12. Margaret Shea was the employee at Fleet that indicated Fleet would not lend up to $1,250,000.00 on inventory, only up to $625,000.00 on inventory.

13. As a result of Fleet's actions, Farash lost $625,000.00 of borrowing capacity that it had available under its loan agreement, which was critical to Farash's operations.

14. Between June and August 2001, Dory brought to Mr. Wainwright's attention the problem with the borrowing base limit of $625,000.00 which was suppose to be $1,250,000.00.

15. Mr. Wainwright indicated that the sublimit is $625,000.00, not $1,250,000.00, but

will review the agreement again and get back to Farash.

16. Dory did not hear back from Mr. Wainwright regarding the borrowing base limit for inventory.

17. Farash had the opportunity to secure a license to manufacture watches using the Puma trademark in July 2001. In order to get the license, Farash would need to invest funds to build Puma inventory for sale. Without the full $1,250,000.00 Farash was not capable of negotiating the Puma license.

18. In August 2001, Farash also commenced discussions with regard to securing an exclusive distributorship license agreement for FILA watches in the United States. FILA had been selling watches worldwide but did not have a US distributorship. In August 2001, Farash bought $160,000.00 worth of FILA watches for resale in the United States in order to encourage the commercial relationship between the parties.

19. FILA's payment terms to Farash were on open credit terms at 60 days, following receipt of the merchandise. As a result of Fleet's unilateral modification of the loan agreement, Farash could not pay the full bill to FILA when due, but paid it partially, and the balance over 3 months.

20. Subsequently, Farash was offered the FILA watch line as an exclusive U.S. Distributor, but had to post a letter of credit because Farash's open credit was no longer acceptable to FILA. Farash was unable to post a letter of credit, due to its diminished cash as a result of Fleet's actions. Moreover, the letter of credit terms of payment would have significantly changed the nature of the Distributorship, rendering the position far less commercially desirable.

21. On or about September 1, 2001, Dory left for Hong Kong for the annual trade fair and meeting with manufacturers.

22. On September 11, 2001, the United States was attacked by Al Queda, in both New York City and Washington, DC. Dory was to return home that day but obviously could not, as the entire U.S Airspace remained closed for several days.

23. On or about September 12, 2001, Robert Wainwright called Dory's office and indicated that he must have a meeting with him immediately. Dory was stuck in Hong Kong until about September 18, 2001. In his absence, Dory had his office return Wainwright's call and relayed the message that he could not yet return to the country. Dory called Mr. Wainwright upon his return. Mr. Wainwright indicated he must meet with him the next day.

24. The next day Mr. Wainwright arrived with his supervisor Mr. Dvorin. Messrs. Wainwright and Dvorin indicated that, starting immediately, there would be a weekly financial reporting requirement in lieu of the monthly reporting requirement specified in the loan documents. Farash was obviously uneasy about this demand to change the loan terms as it would require significantly more resources to just comply with this request on a clerical basis, but he also realized the deleterious effect it would have on Farash's cash availability.

25. Mr. Wainwright countered stating that the weekly reporting requirement was standard for Fleet borrowers and that other Fleet customers did not object to such reporting requirements. However, most Fleet customers report on a monthly basis, not a weekly basis. Mr. Wainwright made these misrepresentations to Farash to try to have them report on a weekly basis.

26. Dory, at that point, again raised the issue of the $625,000.00 shortfall on the inventory borrowing base.

27. Dory asked for Fleet's reply to the borrowing base amount, which was to be $1,250,000.00, not $625,000.00. Mr. Dvorin responded that if Farash wanted to open the question of availability against inventory, the bank would bring in an appraiser, who might well conclude that

the $625,000.00 amount presently made available, should be lowered, not raised. This threat was made for the sole purpose of discouraging Farash from requesting the full borrowing base of $1,250,000.00, to which it was contractually entitled.

28. The discussion over the accelerated reporting was not settled during that meeting. Rather, Dory was subjected to additional phone sessions whereby Farash was forced to agree to provide weekly collateral reports.

29. Dory was further told that if he continued objecting to Fleet's various decisions, the bank could and would begin to enforce the loan agreement in a way which would make it impossible for Farash to comply with its terms.

30. Mr. Wainwright concluded these conversations by stating that Farash's business would in fact be enhanced through these changes and the changes would "flatten out the swings" in Farash's borrowing.

31. In fact, Fleet's unilateral change to a weekly reporting schedule was not Fleet's standard reporting requirements.

32. As of October 1, 2002, when Farash learned that Fleet's weekly reporting requirement was not standard protocol for the bank, and was in fact reserved for only problem clients who had demonstrated either fraudulent reporting or drastic financial distress, Farash insisted that he be allowed to report monthly. The monthly requirement was detailed in his contract and the language was never changed. Fleet rejected Farash's request, although Farash was a profitable company for each year between 1998 and 2001.

33. Under protest and at great cost, Farash submitted the weekly collateral reports starting November 1, 2002.

34. The adverse effects of Fleet making Farash report on a weekly borrowing base was

to:

(a) greatly reduce cash availability with the same collateral and under the same contract;

(b) create a drastically increased workload for Farash, as well as a more hectic office environment, increased administrative costs; and

(c) made it exceedingly difficult, if not impossible, for Farash to forecast its cash requirements, thereby impairing Farash's ability to purchase inventory required by Farash to fulfill its contracts (and to solicit and be awarded new contracts).

35. In November 2001, while Farash had to report weekly, in an effort to mitigate the damage caused by Fleet's unilateral reduction in credit, and having its cash availability significantly reduced, Farash applied for SBA Disaster Relief Funding, under a special section created by the U.S. Government to assist small businesses that were damaged from the September 11, 2001 terrorist attacks.

36. Farash's lowered cash availability and reduced credit line forced it to ship merchandise to its customers at a reduced profit margin. Farash was forced to ship more premium quality watches rather than the mix of watches that its contracts required. Essentially, Farash was forced to deliver premium category watches at standard prices.

37. Farash's SBA application was approved in the amount of $530,000.00.

38. Upon review of the SBA loan documents, and through advice of consultants, Farash realized that Fleet's various and ongoing improper actions, resulted in an extremely volatile predicament, whereby, Farash could be easily placed in "default" of the SBA contract, at Fleet's sole, absolute and arbitrary discretion and also considering the various and numerous warnings,

already threatened to Farash by Fleet. Accordingly, Farash could not execute the SBA contract and was prevented from closing on the new loan. It is also instructive to note that at several points during this SBA lending process, Farash delivered written requests for clarifications to Fleet, including one letter from Farash's attorney, that basically spelled out the entire situation in detail and requested a written reply urgently. All of these letters went unanswered, with the exception of a brief phone call from Bob Wainwright, telling Dory that he was "in left field". It is unclear what exactly was meant by this comment, except, to say that it was not intended to be encouraging.

39. From November 2001 through March 2002, Farash was restricted on the borrowing base to $625,000.00 and Fleet refused to reinstate the borrowing base at the contractual amount of $1,250,000.00. Fleet also continued to insist on weekly reports, although they were not required per the contract terms.

40. At various points, Farash was confronted by his bookkeeper with complaints from Fleet that Farash's reporting was incorrect or somehow improper. Dory wanted to know the exact nature of any discrepancies, to allow him to avoid the same problems going forward. Dory was also concerned that these discrepancies might in fact have been the result of Fleet following through with its earlier threat to find some reason to default Farash.

41. Upon Farash's inquiry, at this point, Mr. Wainwright called Dory with Mr. Dvorin on the line, who stated that Farash should "start looking for another bank."

42. During the period where Fleet refused to reinstate the proper borrowing base at $1,250,000.00, and return to the contracted reporting schedule, Farash had the opportunity to secure licenses to manufacture watches under various well known brand names. However, Farash could not secure any of these licenses, because Farash did not have the cash availability, due to Fleet's breaches of the Agreement.

43. Farash had one last opportunity to secure the FILA distributorship in June of 2002, but was unable to do so, due to lack of cash and since FILA required either cash in advance or a letter of credit.

44. In approximately the same period, the relationship with one of Farash's significant accounts, Starboard, diminished as a result of Fleet's improper conduct.

45. On October 21, 2002, Fleet delivered a letter of termination to Farash, providing for 60 days notice of its demand to be repaid. At every stage, Fleet wasted little time in following through with its various ultimatums.

**FIRST COUNT**

**(Breach of Contract)**

46. Plaintiff repeats and realleges of the allegations in paragraphs 1 through 45 as though set forth more fully hereat.

47. The above-described actions of defendant, including but not limited to, defendant's unilateral changes to contract terms, including a reduction in the authorized loan amount, increased reporting requirements, and threats to cancel the line without cause, are clear breaches of the terms of the contract between the parties.

48. At all times mentioned herein, plaintiff performed according to the terms of the agreement between the parties. Defendants breached the agreement between the parties.

49. As a result of Fleet's breach of the contract between the parties, plaintiff suffered damages, continues to suffer damages and will suffer damages in the future.

**WHEREFORE,** plaintiff demands judgment against the defendants for damages, compensatory damages and punitive damages as well as counsel fees and cost of suit.

**SECOND COUNT**

**(Negligent Misrepresentation)**

50. Plaintiff incorporates the allegations of the First Count of the Complaint as if set forth at length herein.

51. In or around April 2001 as Summit Bank was transforming into Fleet Bank, a Fleet representative, Robert Wainwright, indicated to Farash that Fleet had no plans to change the terms of the existing relationship between Summit Bank and Farash. Specifically, as Mr. Wainwright visited Summit customers in anticipation of the transition, he indicated the visit was to assure them that the bank was going to maintain these existing relationships without change on a going forward basis and would remain stable.

52. In fact, Fleet had already decided to and did significantly change the existing relationship between Fleet and Farash to the detriment of Farash. Fleet's loan officers knew that their statements were false when made.

53. Farash relied upon the negligent misrepresentations made by Robert Wainwright in deciding not to make arrangements with another commercial lender. Mr. Wainwright knew of this decision and justifiable reliance by Farash.

54. As a result of Farash's justifiable reliance upon the negligent misrepresentations of Fleet (via Mr .Wainwright), Farash was damaged.

55. Mr. Wainwright also stated that Fleet customers report on a weekly basis, not monthly basis. Mr. Wainwright knew his statements were false when made.

**WHEREFORE,** plaintiff demands judgment against the defendants for damages, compensatory damages and punitive damages as well as counsel fees and cost of suit.

**THIRD COUNT**

**(Breach of the Covenant of Good Faith and Fair Dealing)**

56. Plaintiff incorporates the allegations of the First and Second Counts of the Complaint as if set forth at length herein.

57. Additionally, defendants and their representatives made assurances to plaintiff, that upon the transition of Summit Bank to Fleet Bank, all terms and procedures of the agreement and relationship would remain the same, therefore, there was no need for plaintiff to look elsewhere for another lender.

58. Plaintiff and Summit agreed upon specific terms regarding, *inter alia,* lending money.

59. By operation of law, the parties' contract included the covenant of good faith and fair dealing.

60. At all times hereto defendants breached the covenant of good faith and fair dealing because they, and their responsible employees, did not have an honest belief that good cause for unilaterally changing the terms of the agreement between the parties existed. Further, defendants attempted to deprive the plaintiff of the benefit of its bargain as specified in the agreement between the parties for its own benefit. Moreover, defendant's loan officers knowingly made false statements to plaintiff. For example, defendant Fleet indicated that Fleet borrowers report on a weekly basis, not a monthly basis. In fact, Fleet's reporting procedure is on a monthly basis. Fleet's representatives also falsely stated Farash failed a field exam when in fact no such exam took place. These knowing falsehoods were made for the purpose of harming plaintiff.

61. As a result of the bad faith conduct of defendants, plaintiff was damaged.

**WHEREFORE,** plaintiff demands judgment against the defendants for damages, compensatory damages and punitive damages as well as counsel fees and cost of suit.

**FOURTH COUNT**

**(Consumer Fraud N.J.S.A. 56:8-2)**

62. Plaintiff incorporates the allegations of the First, Second and Third Counts of the Complaint as if set forth at length herein.

63. Defendants misled, deceived and damaged plaintiff by way of defendant's false promises, negligent misrepresentations, and the knowing, concealment, suppression and omission of material facts with regard to the way in which it would change the agreement between the parties.

64. Specifically, defendant's inducements to have Farash continue banking with Fleet after it took over the business of Summit, were knowing misrepresentations of the pending course of events. In fact, after the transition, defendants reduced Farash's agreed lending limit of $1,250,000.00 to $625,000.00 for inventory. Additionally, Fleet required weekly reporting as opposed to the monthly reporting requirement specified in the March 27, 2000 agreement between the parties.

65. Robert Wainwright represented that the weekly reporting requirements were standard for Fleet. He further represented that Fleet would not be looking to change the banking relationship and the loan agreement would remain unchanged. Defendant made these false promises, pretenses and misrepresentations knowing that plaintiff would rely upon these concealments in connection with the subsequent performance of the agreement between the parties. Defendant made these statements knowing they were false when made. Plaintiff in fact relied upon these falsehoods. Plaintiff was reasonable in relying on these falsehoods because they were made by vice presidents of defendant who were also senior loan officers.

66. Accordingly, plaintiff suffered damages, will suffer damages and continues to suffer damages as described above. For example, plaintiff did not secure alternate financing when it could

have done so on favorable terms. Plaintiff would have secured an SBA loan or another commercial loan.

**WHEREFORE,** plaintiff demands judgment against the defendants for damages, compensatory damages and punitive damages as well as counsel fees and cost of suit.

**FIFTH COUNT**

**(Common Law Fraud)**

67. Plaintiff incorporates the allegations of the First, Second, Third and Fourth Counts of the Complaint as if set forth at length herein.

68. Defendants misled, deceived and damaged plaintiff by way of false promises, negligent misrepresentations, and the knowing, concealment, suppression and omission of material facts with regard to the way in which it would change the agreement between the parties.

69. Specifically, defendant's inducements to have Farash continue banking with Fleet after it took over the business of Summit, were knowing misrepresentations of the pending course of events. In fact, after the transition, Fleet reduced Farash's agreed lending limit of $1,250,000.00 to $625,000.00 for inventory. Additionally, Fleet required weekly reporting as opposed to the monthly reporting requirement specified in the March 27, 2000 agreement between the parties.

70. Robert Wainwright represented that the weekly reporting requirements were standard for Fleet. Defendant made these false promises, pretenses and misrepresentations knowing that plaintiff would rely upon these concealments in connection with the subsequent performance of the agreement between the parties. Defendant made these statements knowing they were false when made. Plaintiff in fact relied upon these falsehoods. Plaintiff was reasonable in relying on these falsehoods because they were made by vice presidents of defendant who were also senior loan officers. For example, plaintiff did not secure alternate financing when it could have done so on

favorable terms. Plaintiff would have secured an SBA loan or another commercial loan.

71. Accordingly, plaintiff suffered damages, will suffer damages and continues to suffer damages as described above.

**WHEREFORE,** plaintiff demands judgment against the defendants for damages, compensatory damages and punitive damages as well as counsel fees and cost of suit.

SORIANO, HENKEL, SALERNO, BIEHL
AND MATTHEWS, P.C.

BY: Frederick C. Biehl, III

DATED: March 6, 2003

**JURY DEMAND**

Plaintiff hereby demands a jury trial as to all issues triable by a jury.

Frederick C. Biehl, III

DATED: March 6, 2003

**4:5-1 CERTIFICATION**

I certify that based upon the information currently in my possession, the matter in controversy is not the subject of any other action pending in any court or of a pending arbitration proceeding and, at this time, no other action or arbitration proceeding is contemplated. At this time, I know of no other persons who should be joined in this action.

Frederick C. Biehl, III

DATED: March 6, 2003