UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| FARASH & ROBBINS, INC. : | HONORABLE DENNIS M. CAVANAUGH |
| Plaintiff(s), : | |
| : | |
| -vs- : | Civil Action No. 03cv361(DMC) |
| : | |
| FLEET NATIONAL BANK AS : | |
| SUCCESSOR OF SUMMIT BANK, : | |
| : | OPINION |
| Defendant(s), : | |
| _____ : | BENCH TRIAL INCLUDING |
| FLEET CAPITAL CORPORATION, : | FINDINGS OF FACT AND |
| : | CONCLUSIONS OF LAW |
| Counterclaim and : | |
| Third Party Plaintiff, : | |
| : | |
| -vs- : | |
| : | |
| FARASH & ROBBINS, INC, : | |
| : | |
| Counterclaim-Defendant, : | |
| : | |
| and ISIDOR FARASH, : | |
| : | |
| Third Party Defendant, : | |
| _____ : | |

**THIS MATTER** was tried before the Court without the benefit of a jury on December 12, 13, 18-20, 2006 and January 3, 4 and 8-11, 2007. At the close of evidence, the parties were given ample opportunity to submit Proposed Findings of Fact and Conclusions of Law to assist the Court in its findings.[1]

---

[1] As seen below, the Court has adopted a number of the proposed findings of fact and conclusions of law submitted by the parties.

The Court has received and reviewed the parties' submissions, the documentary evidence produced at trial as well as the full trial transcripts. The Court now renders its decision and findings pursuant to Federal Rule of Civil Procedure 52.

Based upon the following, the Court finds by a preponderance of the evidence in favor of Defendant-Counterclaimant and Third Party Plaintiff Fleet Capital Corporation and against Plaintiff and Third Party Defendant Farash & Robbins, Inc. and Isidor Farash.

## THE PARTIES

Isidor Farash is the owner of Farash & Robbins, Inc., a New Jersey Corporation (F&R). F&R is engaged in the wrist watch business. F&R is an importer and wholesale distributor of wrist watches whose primary business is to sell wrist watches in the retail trade in the form of watch assortments. To create watch assortments, F&R grouped various watches into variety packages of approximately twenty-five or thirty-five pieces sold at the same price for each watch, regardless of brand or model. F&R's largest customer from 1998 through 2002 was Starboard Cruise Services, Inc. (Starboard), an on-board cruise retailer. Starboard sold F&R's watch assortments duty free aboard its customer cruise ships.

Defendant/Counterclaimant, Fleet Capital Corporation (FC) is the successor to Summit Bank with whom F&R, as borrower and Farash as guarantor, entered into a loan and security agreement to provide working capital to F&R.

**CLAIMS**

Plaintiff has sued Defendant for breach of contract and breach of the covenant of good faith and fair dealing. Defendant-Counterclaimant brings claims against F&R and Farash for breach of contract for the amounts owed by F&R under the loan agreement, breach of contract for amounts owed by Farash under the limited guarantee, conversion of the Schedule A collateral against F&R and Farash and fraud against F&R and Farash for conversion of FC's loan proceeds.[2]

**CREDIBILITY OF WITNESSES**

With respect to the witnesses who testified, I found those who were presently or previously employed by the Bank (FC or Summit) to have been credible and truthful. Plaintiff based its case primarily on the testimony of Isidor Farash. I found Mr. Farash to be less credible and at times not believable. During his testimony there were several examples wherein he contradicted himself or testified differently than he testified previously or made statements that were contrary to statements made in prior filings.

---

[2]This Court previously dismissed F&R's claims for negligent misrepresentation, fraud, and punitive damages by Opinion and Order, dated February 13, 2004, pursuant to FC's motion to dismiss. Furthermore, this Court granted FC's motion for summary judgment as to F&R's consumer fraud act claim (N.J.S.A. 56:8-2), by Opinion and Order, dated December 16, 2005. In its December 16, 2005 Opinion, this Court denied F&R's summary judgment motion against FC in its entirety.

## FINDINGS OF THE COURT

F&R has brought suit against its lender (FC) claiming that due to FC's breach of contract F&R was literally driven out of business. Defendant-Counterclaimant on the other hand, takes the position that this is merely a straight forward case of F&R's failure to repay its loan of $1.5 million plus interest. F&R brought suit shortly after having drawn down the maximum amount available under the loan agreement.[3] F&R acknowledges that it has not repaid any portion of its loan or the interest due thereon since FC demanded repayment. It is FC's position that on or about

---

[3] F&R, a vendor of watch assortments, has been wholly owned by Farash at all relevant times. In 1998, FC's predecessor, Summit Bank ("Summit"), F&R (borrower) and Farash (guarantor) entered into a Loan and Security Agreement ("Loan Agreement"), to provide working capital to F&R. F&R's availability under the Loan Agreement was determined under a "Borrowing Base" formula consisting of a percentage of F&R's "Eligible Accounts Receivable" and "Eligible Inventory." As collateral for the credit facility, F&R granted Summit a first priority security interest and lien on all of its property identified on Schedule A ("Schedule A Collateral"), including F&R's inventory. FC perfected its security interest in the Schedule A Collateral. The Loan Agreement was modified twice, pursuant to loan modification agreements, dated October 13, 1998, ("First Modification") and March 27, 2000, ("Second Modification"). The Loan Agreement, First Modification and Second Modification are collectively referred to herein as "Loan Agreement." The Second Modification (i) increased the maximum principal amount of the credit facility to $1,500,000, and (ii) modified the "Borrowing Base" to "up to (a) 80% of the Borrower's Eligible Accounts Receivable under 90 days from original invoice date ... plus up to (b) 50% of the value of the Borrower's Eligible Inventory ... on hand up to a maximum of $1,250,000 with respect to Eligible Inventory." In connection with the Second Modification, F&R executed and delivered a Revolving Line of Credit Note ("Third Note"), in the amount of $1,500,000, the maximum principal amount under the Loan Agreement, and Farash executed and delivered a limited personal guarantee of up to $350,000 ("Limited Guarantee"). FC is the successor in interest to Summit under the Loan Agreement, Third Note, and Limited Guarantee.

October 21, 2002, when F&R refused to comply with its contractual obligations under the loan agreement, which included F&R's delay in allowing a mandatory field examination of its inventory and in submitting certain financial information, FC provided F&R with a 60-day notice of its intention to demand full payment of all sums due ($1.5 million plus interest). Faced with that demand, F&R responded by bringing this action several days prior to the expiration of the 60-day notice period.

When Plaintiff's business began to fail F&R brought this suit as a preemptive strike against Defendant claiming lender liability in that due to the fact that FC created difficulties in allowing Plaintiff to obtain monies it needed pursuant to the asset base lending agreement, Plaintiff was unable to keep its business afloat or expand with other potential customers.

The facts, amply demonstrated by the evidence, simply do not support Plaintiff's position. The facts demonstrate that the Bank loaned Plaintiff 100% of that which it agreed to loan, $1.5 million, and any problems that arose with the formula for lending arose as a result of Plaintiff's own sloppy bookkeeping and its errors in submitting inaccurate Borrowing Base Certificates (BBCs) which were necessary to secure monies under the loan agreement.

Throughout the borrowing relationship, F&R was required to prepare, execute and submit Borrowing Base Certificates to Summit and, subsequently to, FC. The BBCs were sworn statements

certifying the value of F&R's "Eligible Accounts Receivable" and "Eligible Inventory."

F&R's available credit amount, at any given point, was determined by applying the Borrowing Base formula in the credit facility to F&R's "Eligible Accounts Receivable" and "Eligible Inventory," as reported in its BBCs. (See prior footnote 3).

Typically, Summit and FC provided standard form BBCs to their borrowers.

In entering into its asset loan agreement with the Bank, F&R agreed that depending upon the amount of its inventory and accounts receivable, a formula would be created whereby it would receive loans to run its company. The formula provided that Plaintiff would be able to borrow up to 50% of the value of its inventory not to exceed $1.25 million (ultimately raised to $1.5 million). However, on the BBCs submitted by Plaintiff to the Bank, Plaintiff's bookkeeper entered one-half that amount thereby theoretically reducing the amount of the potential loan from $1.25 million to $625,000.00. In other words, the Bank would loan F&R monies as long as F&R could demonstrate proper collateral through BBC reporting and inventory. Although it was clear from the evidence that it was Plaintiff's error or that of its bookkeeper, Plaintiff is now attempting to place fault on Defendant in not picking up or observing the mistake on the BBC and advising Plaintiff of its own error. It should also be noted that Farash

6

himself signed off on the BBCs on a regular basis giving him the opportunity to correct the mistake. Plaintiff is attempting to place a burden on the Bank that does not and should not exist.

FC also correctly argues and the evidence supports, that even if Plaintiff were correct in its claim, and the Bank could somehow be found at fault for Plaintiff's mistake, nevertheless FC did indeed loan Plaintiff the total amount that was sought under the agreement and therefore would not be liable for any alleged problems that Plaintiff encountered in its business.

Plaintiff does not dispute that the bulk of its business, approximately 80%, was with its main customer, Starboard.[4] The evidence showed that after the 9/11 attacks on the World Trade Center, the travel industry became depressed. Since Plaintiff's business was selling assortment watches on cruise ships and since the cruise ship industry suffered after 9/11, it is not surprising

---

[4] Notably, F&R, which had lost many of its major accounts by 2001, had already experienced a major deterioration in its business relationship with Starboard (its paramount customer) *prior* to September 11. In 2000, Starboard (then known as Greyhound Leisure Services) was acquired by LVMH Moet Hennessy Louis Vuitton ("LVMH"), and became known as Starboard Cruise Services, Inc. At trial, Farash acknowledged that, following the LVMH acquisition, there was a failure of communication between Farash and Starboard's new management. Starboard's new management examined market trends and concluded that it had become more difficult to sell the large number of "promo watches" that the company had sold in the past. Starboard management recognized that its business model had changed because customers now wanted to buy recognized brands rather than "promo watches." Starboard stores began to advise Starboard management that non-widely recognized brands were more difficult to sell and that, accordingly, they needed more recognized brand watches. Accordingly, the relationship between Starboard and F&R had significantly deteriorated prior to September 11.

7

that Plaintiff's business would also suffer. Furthermore, Starboard changed the way it conducted its business with Plaintiff by way of returning more of its product as unsaleable, taking longer to pay Plaintiff for goods purchased, and slowing down some orders that it placed previously for future delivery, all factors that adversely impacted Plaintiff's cash flow and business in general. This helped cause an erosion of the relationship between F&R and Starboard. Eventually, for reasons having nothing to do with FC, Plaintiff lost Starboard as a customer completely.

While Farash attempts to blame his failed business on actions of FC's employees, the testimony and evidence educed fails to support such claims. On the contrary, it was Mr. Farash's conduct or market trends that created F&R's problems.

First, as mentioned above, the errors on the BBCs were created by F&R. Although Mr. Farash claims that the demands made by FC were improper or in violation of the underlying contract, the Court finds just the opposite to be true. When the original contract was entered into, it was understood that there would be monthly BBCs which would allow F&R additional borrowing up to its limits. Due to irregularities in the BBCs filed by F&R, and the conduct of Mr. Farash in dealing with employees at FC, pursuant to the contract FC demanded weekly rather than monthly BBCs. The evidence supports FC's position that FC routinely sought weekly and sometimes daily reporting from its borrowers. Furthermore, the loan agreement

itself expressly authorized FC at its discretion to request additional financial information from F&R. As stated above, the evidence amply demonstrated that it was the loss of Starboard's business which decimated F&R rather than FC's requests for more frequent financial reports in the form of weekly BBCs.

Regarding F&R's claims that FC was responsible for F&R's failure to gain a licensing or sales agreement with PUMA and/or FILA, there is virtually no evidence to support such a claim.

With respect to PUMA, there was evidence that Mr. Farash had several conversations with a friend who allegedly had contacts with PUMA. There is no evidence that the Bank did anything to harm Plaintiff's potential relationship with PUMA since at best Plaintiff was merely testing the waters to see if it could find a new client, however nothing came of it.

With respect to FILA, again while Mr. Farash did enter into discussions with FILA to expand FILA's vendors, F&R refused to be bound by the "take it or leave it" contract submitted by FILA. Furthermore, testimony revealed that FILA was attempting to distribute its products to high end stores such as Nordstrom's and Bloomingdale's, establishments where Plaintiff did not sell. After Plaintiff received the aforementioned contract, Farash wrote back to the representative of FILA with a somewhat nasty note making it clear that he would not enter into such an agreement. Since FILA would not negotiate or change the terms of its proposed

9

agreement, the discussions ended. Again, this failed endeavor had nothing to do with Plaintiff's ability or inability to borrow more money from FC. F&R simply could not abide by the demands of FILA.

It should also be noted that Mr. Farash is a rather difficult individual. He surreptitiously tape recorded telephone calls and meetings of representatives from FC without their knowledge. He also made things difficult with respect to the submission of BBCs. Finally, he refused a timely inspection of F&R's premises so the bank representative could review and check inventory, something the Bank had every right to do under the contract. Furthermore, in his business dealings with his customers and the Bank employees he was argumentative, sarcastic and on more than one occasion when not satisfied with his dealings with representatives at one level, Farash went over their heads to their superiors thus creating more tension and difficulty in his business dealings.

As an example, in May of 2002, Farash went "over the head" of his principal contact at Starboard, Mr. Rick Cusick, by directly contacting Cusick's supervisor, Ed Brennan, to discuss ongoing issues Farash had with Cusick without Cusick's knowledge. On May 11, 2002, Cusick sent Farash a pointed e-mail stating that:

> I just received an e-mail from Ed informing me of your call. Dory (Farash), suffice to say, I am surprised and disappointed that you have chosen such a tact. I feel that this is very unprofessional and totally uncalled for. Ed is much to busy to get involved in such a level of detail. Your call to him has insinuated that you do not have confidence and

>respect enough in the management of Starboard, specifically myself, Pam and Rob, to work through our mutual challenges. I am very disappointed... I do not think this "behind the scenes" "end round", "cheap shot" tact will do anything but undermine the goal of reestablishing a successful business. You really blew it...

Starboard was a loss from which F&R could not recover.

Since the Court finds that there is no liability upon FC, a detailed discussion of damages is not necessary. Suffice it to say however, because the evidence demonstrates that F&R's purported business opportunities were highly speculative, any damages sought for lost or anticipated profits would certainly also be speculative. "Profits which are largely speculative, as from an activity dependent on uncertain or changing market conditions, or on chancy business opportunities, or on promotion of untested products or entry into unknown or unviable markets, or the success of a new and unproved enterprise, cannot be recovered. Factors like these and others which make a business venture risky in prospect preclude recovery of lost profits in retrospect." PFI, Inc. vs. Kulis, 363 NJ Super. 292, 301(App. Div. 2003).

In addition, during his testimony, Farash admitted that his opinions regarding potential profits were arbitrary and merely what he thought as opposed to anything with a basis in fact. His testimony regarding damages was largely unsupported.

Accordingly, since F&R offered no evidence in support of anything but highly speculative damages, no damages could be

11

awarded.

The Defendant's witnesses were credible and believable. They were bank employees who were doing their best to oversee loans. This was their job. As stated above, Plaintiff was somewhat uncooperative. Also, due to its inventory methods, it was very difficult to obtain an accurate count of its product other than twice a year when a hands-on inventory review occurred. Therefore, it was reasonable that the Bank would seek further information from Plaintiff regarding its supposed inventory claims. The bottom line is that the BBCs submitted by Plaintiff were inaccurate due to among other things the type of inventory analysis that Plaintiff conducted.

The Court also finds that Plaintiff attempted to obtain other sources of funding, however F&R did not do so or would not do so since FC was affording F&R a better financial arrangement. Plaintiff also had an opportunity to borrow from the Small Business Association (SBA) but chose not to do so because Farash did not wish to encumber other personal properties. The SBA, in an effort to assist small businesses in the aftermath of 9/11, offered loans at favorable rates.

Therefore, while other sources of funding or loans were available, Plaintiff chose not to pursue those sources.

Because F&R has failed to establish any damages related to or caused by FC's conduct, F&R's breach of contract claim fails.

As stated above, the evidence amply demonstrates that FC did not violate the covenant of good faith and fair dealing because it did not reduce the inventory supplement it had agreed to and in requesting that F&R submit weekly BBCs following September 11, FC exercised its contractual right to require such additional financial reporting and it did so in good faith.

The Third Circuit explained the applicable standard under New Jersey law:

> While the "principle of fair dealing pervades all of [New Jersey] contract ... *[t]hat principle will not alter the terms of a written agreement.*" Rudbart v. North Jersey District Water Supply Comm'n, 127 N.J. 344, 605 A.2d 681, 692(1992). "The implied duty of good faith and fair dealing does not operate to alter the clear terms of an agreement and may not be invoked to preclude a party from exercising its express rights under such an agreement." Fleming Cos., Inc. v. Thriftway Medford Lakes, Inc., 913 F. Supp. 837, 846 (D.N.J. 1995) (citing Glenfed Fin. Corp. v. Penick Corp., 276 N.J. Super. 163, 647 A.2d 852, 858 (1994). So, where the terms of a contract are not specific, the implied covenant of good faith and fair dealing may fill in the gaps where necessary to give efficacy to the contract as written. *But where the terms of the parties' contract are clear, the implied covenant of good faith and fair dealing will not override the contract''s express language.*

Fields v. Thompson Printing Co., 363 F.3d 259, 271-72 (3d Cir. 2004) (emphases added).

Similarly, F&R adduced no evidence that FC in requesting weekly BBCs, had any bad motive or intention which is a necessary

13

element in maintaining a claim for breach of the covenant of good faith and fair dealing. See Wilson v. Amerada Hess Corp., 168 N.J. 236, (2001). Here, the evidence shows that Robert Wainwright, the FC loan officer who requested the change, believed the submissions of weekly BBCs would actually assist F&R by improving cash flow and reducing borrowing costs with accumulated interest.

Due to the fact that the evidence demonstrates that FC acted in good faith under the contract, F&R has not set forth evidence to support its claim for breach of the covenant of good faith and fair dealing.

With respect to the counterclaims, there is no question, and the Court so finds, that FC loaned F&R $1.5 million along with anticipated interest, and F&R has failed to repay any of the outstanding balance since requested by FC in October of 2002. Farash signed as a guarantor on the loan. Both of these facts were admitted to by Farash during his testimony at trial. These are undisputed facts.

In addition, FC contends that F&R and/or Farash breached the contract which existed between Plaintiff and Defendant; that FC performed its obligations under the contract; and that FC was damaged as a result of F&R and/or Farash's breach. The Court finds that a valid contract existed and that FC performed its obligations under the contract which was breached by F&R and Farash. FC is entitled to prevail because the evidence at trial demonstrated that

it acted reasonably and in good faith in exercising its contractual rights and that F&R and Farash breached the contract.

The evidence also amply supports FC's claim that Farash breached the limited guarantee he previously entered into.

It is well settled law that the interpretation of a limited guarantee is a matter for the court and when its terms are clear and unambiguous, the court should enforce the terms as written. <u>Center 48 Ltd. Partnership v. May Department Stores Co.</u>, 355 N.J. Super. 390 (App. Div. 2002).

As stated above, Farash acknowledged that he executed a limited guarantee in which he "absolutely, unconditionally, and irrevocably" guaranteed the payment for up to $350,000 owed by F&R to FC. Since the evidence established that F&R has defaulted under the loan agreement, and FC provided Farash of notice of its demand for payment to FC, and such payment was not made, Farash is liable to FC for any portion of the $350,000 owed under the limited guarantee. Accordingly, as a result of the facts adduced by FC at trial, FC is entitled to prevail against Farash for breach of the limited guarantee. The Court so finds by a preponderance of the evidence.

As security for payment of amounts due under the loan agreement, F&R executed and delivered a continuing security interest in the Schedule A Collateral which included F&R's inventory. Farash acknowledged at trial that subsequent to F&R's

default, instead of maintaining the inventory which was collateral, F&R and Farash elected to dissipate such inventory. As a result, FC seeks to hold F&R and Farash liable for conversion.

Under New Jersey Law, conversion is "an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." Slowinski v. Valley National Bank, 264 N.J. Super. 172, 189 (App. Div. 1993). Where an officer of a corporation exercises ownership rights over property designated as security for a loan agreement to the exclusion of the lender's rights, this conduct constitutes conversion, and that officer is personally liable for the loss. Glenfed Fin. Corp. V. Penick Corp., 276 N.J. Super. 163, 181-82 (App. Div. 1994).

There is little doubt that Farash did indeed dissipate or sell off his inventory. However, the asset loan agreement that F&R entered into with FC contemplated an ongoing fluid relationship wherein loans would be made based upon a formula which took into consideration inventory value, recognizing that the inventory would come and go. There was much testimony during trial regarding the methods used to determine and report inventory. The Bank understood that the method used by F&R was somewhat of an estimate

16

rather than a precise count.[5] When Farash felt the Bank was creating difficulties and in effect throwing up road blocks to his ability to borrow further, the relationship between him and his company and the Bank and its employees and loan officers began to sour. The nature of the business and the depletion of inventory in order to keep the business afloat was understood by all. The evidence adduced indicates that there has been no diversion of funds and no secretion of collateral during the term of the contract. In fact, the evidence supports F&R's argument that it operated its business during the term of the loan and deposited all funds in the F&R company account. Furthermore, Fleet has not established an immediate right of possession to the funds or collateral at issue, such as a fiduciary relationship. "It is essential that the money converted by a tort feasor must have belonged to the injured party." Commercial Ins. Company of Newark vs. Apgar 111 NJ Super. 108, at 114 (1970). FC's appropriate remedy sounds in contract. Accordingly, the Court is not satisfied that FC has proven its conversion claim by a preponderance of the evidence and therefore finds in favor F&R and Farash on this point.

Finally, FC charges fraud by F&R and Farash in that they falsely reported the borrowing availability under the credit facility. As this Court previously recognized in its February 13, 2004 Opinion at page 9 (quoting Eli Lilly and Co. v. Roussel Corp., 23 F. Supp. 2d 460, 491-92 (D.N.J. 1998); Gennari v. Weichert

---

[5] F&R had no "perpetual" inventory system in place and therefore relied upon a "roll forward" method to obtain current value.

Realtors, 148 N.J. 582, 610 (1997) "The five elements of a fraud claim are: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon; and (5) resulting damages".

In order for this Court to find that F&R and/or Farash committed a fraud, it would have to be satisfied that there was an intentional overstatement of the value of the F&R inventory to support the fact that F&R borrowed funds which it was not entitled to under the credit facility. As stated above, the inventory figures submitted by F&R were material because F&R's borrowing was on 50% of the value of it "eligible inventory" to a maximum of $1,250,000. "Eligible inventory" was merely that which had value and could be used as collateral. In other words, inventory that was broken, used or otherwise of questionable value would not be considered eligible. FC claims that F&R artificially inflated its borrowing availability under the BBCs by misclassifying as "eligible inventory" goods worth in excess of $400,000 that should have been designated "ineligible inventory". While the description of the inventory is important and certainly relevant to F&R's borrowing ability, the classification of the inventory is subject to interpretation.

As counsel for F&R and Farash correctly points out in its post-trial submissions, not every potential mistake could or should be construed as "fraud". Honest mistakes were certainly a possibility. Fleet has failed to prove false representations of material facts were made in the borrowing base certificates. As

18

stated above, the BBC's were completed pursuant to the roll forward method of inventory which was well known to Fleet as an inexact method of inventory calculation since it relied upon historical data. The Courts finds that neither representatives of F&R nor Farash intentionally tried to deceive Fleet in its financial reporting. Accordingly, since the elements necessary to support a fraud claim have not been met by a preponderance of the evidence, FC's claim for fraud must fail and the Court finds in favor of F&R and Farash on this issue.

During the course of trial, the parties sought and the Court reserved decision on motions for a directed verdict pursuant to F.R.C.P. 52(c). The Court has now had an opportunity to review the matter in its entirety and those motions wherein the Court reserved decision are **denied**.

**CONCLUSION**

Counsel for Defendant-Counterclaimant is directed to submit an appropriate form of Judgment pursuant to Rule 58 consistent with the findings contained in this Opinion in favor of Defendant-Counterclaimant, including interest and allowable costs of suit.

**DENNIS M. CAVANAUGH**<br>**United States District Judge**

Dated:    June 11, 2007  
cc:       All Parties  
             Hon. Mark Falk, U.S.M.J.